Chief Justice Robertson
delivered the Opinion of the Court.
This is a suit' in Chancery, instituted by Wesley Hog-gbis, to rescind a contract with Aquilla Becraft, for a horse which lie had bought from said Aquilla, and to enjoin-a judgment which Jonathan Becraft, as assignee of iquilla, had obtained against hkn- fH-oggins) on a nota u , , for the price of the horse;
The bill contains appropriate and sufficient allegations; the principal of which are: 1st. that the horse was “thick or broken winded2nd. that the seller fraudulently concealed the defect^ — and, 3rd. that, within a reasonable time after a discovery by the- plaintiff, he returned the *29 horse to the seller, In whose possession it ever afterwards remained.
j?aet3 an¿¡ c;,._ cymstances of *
The answer denies that the'horse was “unsound,” or “ deficient;” insists that it was not returned in reasonable time, and alleges that Aquilla Becraft had not consented to receive it, although it had continued to remain in his possession.
The following facts are satisfactorily established by the record, when scrutinized and properly understood : 1st. that the horse was “ thick winded” at the time of the contract ; 2nd. that the defect was permanent; 3rd. that it materially diminished the vendible value of the horse ; 4th. that this fact must have been known by Aquilla Be-craft, at and prior to the sale; 5th. that Hoggins had 'not, at the time of the contract, an effectual opportunity for ascertaining the defect, and was lulled by the assurances of Becraft; 6th. that he discovered, on the day of the contract, on his way home with the horse, that it made a peculiar noise in respiring, after it became heated, or when it moved briskly ; but he and others, whom he requested to examine the horse, were inclined then, and for some iveeks afterwards, to think that the blowing was occasioned either by a temporary £i cold,” or by “thedisn temper,” then incipient and undeveloped ; 7th. that it has been since ascertained, that the horse has not had the distemper since the date of the- contract, that it was well kept by Hoggins, and, when returned, was, in every respect, in as good condition as at the date of the contract ; 8th. that, about ten days after the date, Hoggins sent a message to. Aquilla Becraft, communicating hisap-prehension, as to. the condition of the horse, and requesting him to meet him at Paris on a designated day, within two weeks; to investigate and adjust the matter; the message was forthwith communicated to Becraft, (but it does not appear that he attended to it;) the horse was sent to him about the middle of February, 1830, with an accompanying letter from Hoggins, but he did not receive the horse; 9th. the horse was left in Becraft’s possession about the first of March, 1830, where it still remained in August, 1831, when the last depositions were taken in this case ; 10th. the contract was made No vein* *30 ber 23rd. 1829; the note was assigned in April, 1830. There was no warranty of soundness.
Vendee of a ering^a ^defect which the venfy1 concealed^ may return, or and rescind the contract — one-cover damages,
To have a resale^of a°cFr tel on account of a fraudulent unsoundness, there must be a return, or tender, ofthe chattel to the vendor, within a reasonable time — what that is, must depend upon the circumstances of each particular case. — While the true nature of the unsoundness' (as whether it be permanent’or temporary) remains uncertain, it is not too late — provided the vendee acts in good faith, and no act of his has impaired the value in the mean time.
The circuit court dismissed the bill, because (in the opinion of that court,) the horse was not returned within a reasonable time.
The foregoing facts are sufficient to shew that the pjain- ^ ^as been injured, and has a legal claim to redress in some mode, and to some extent.
On making the discovery of the wrong, he had a right to elect either to keep the horse, and sue for damages, or to return, or offer to return it, and rescind the contract. If he so acted as to entitle himself to a rescission, the chancellor should have decreed the relief sought by the bill.
But to entitle himself to such relief, it was necessary ^ie should have returned, or offered to return, the horse in a “ reasonable ” time, and consequently, whether |ie so or not js tjie oniy question to be considered,
The law has not defined “ reasonable lime.” It cannot be defined by any prescribed rule. What is reasonable in one case, may be unreasonable in another case." What is reasonable in any case, must be ascertained by the application of reason to the facts which characterise the particular case. Delay for one week after full discovery may be unreasonable in some cases : a much longer delay may, in other cases, be reasonable. The injured party should observe ordinary vigilance and good faith. He should not, by culpable negligence, or by design, subject the other party to unnecessary inconvenience, loss or hazard; and, whenever he offers to return the property, it should be in as good a condition as it was, when he might first have returned it after full discovery of its defectiveness, só as to place both parties, as nearly asposssble, in statu quo. All this may appear in a sup-posable or possible case, even though months may have interlapsed; it may not appear in another possible case in which one week had evolved. Time, in- the abstract, is not essential. ■ It is material so far only, as, when associated with other circumstances, it may produce injurious or unjust consequences.
The great object of the rule of law on this subject, is to prevent injury or wrong to the vendor ; and the main *31 question in every such case, should be — “ has he any just cause to object to the rescission of the contract ?” “Has he been trifled with ? Will he have suffered by unnecessary and improper delay ?”
The foregoing outline presents the principle as fully and distinctly as this court can exhibit, by any general definition, that which cannot be perfectly understood or defined, except by exemplification. Authority directly applicable to the facts of this case cannot be expected. And therefore, as the question involved, is one of reason and of fact, rather than of a rule of law, it may not be improper to refer to unauthoritative cases, for the purpose of exhibiting the light reflected from reason and intelligence.
In Curtis vs. Hanny, a purchaser of a horse, (upon warranty of soundness,) resisted a judgment for the price, by proving that the horse was diseased in its eyes at the date of the contract, and that he offered to return it about seven weeks after he discovered the defect. It appeared that the discovery was made the day succeeding the sale; but the purchaser, suspecting that the horse was also diseased in its feet, attempted a cure by the application of some nostrum, and thereby produced a new disease accompanied by lameness, of which, however, the horse had recovered before the tender ; and it appeared that, at the time of the tender, the condition of the horse was as good as it was at the time of the sale. JVo reason for not making the tender sooner, was offered, nor did it appear that the seller had sustained any loss by the delay. In delivering liis opinion on these facts, Lord Eldon, Ch. J. B. C. (among other things,) said : — “ The question was, would the horse when returned to the seller, be diminished in value by this doctoring ? — The seller had a right to expect that the horse should be returned in the same state he was when sold, and not by any means, diminished in value; for if a person keeps a warranted article any length of time after discovering its defects, and when he returns it, it is in a worse state than it would have been if returned immediately after such discovery, I think the party has no defence, &c. but is left to his action ; ” and he concluded by saying, “if the jury thought that if *32 any future purchaser was to be told, that the horse had been blistered and doctored, it would diminish its value in the estimation of such purchaser, they should find a verdict for the plaintiff.” (3rd Esp. Rep. 82.)
Here the distinguished Judge seemed to think, that, as the condition of the horse was as good at the date of the tender as it was when the horse might, first after the discovery of its unsoundness, have been returned, the contract ought to be considered as rescinded, notwithstanding the delay of seven weeks, unless the jury should be of opinion that the “doctoring” had impaired the vendible value.
A similar doctrine was recognised by the Supreme Court of Massachusetts, in the case of Kimball vs. Cunningham, (4th Mass. Rep. 502.)
In this case there is no reason for presuming that the delay was, in any respect, prejudicial to Aquilia Becraft, the seller. There is no reason for inferring that Hoggins has trifled with his interest, or attempted to speculate upon contingencies, or has been guilty of bad faith, or even of any culpable negligence ; but, on the*contrary, the facts authorize a deduction perfectly consistent with his good faith, candor, prudence and justice ; and there is no proof that Becraft sustained any loss by not having the possession of the horse; nor can such loss be inferred from any thing which appears.
As there was no warranty, Hoggins would have had no legal cause of complaint, had the blowing of the horse been the consequence of any temporary affection — such as distemper or cold — unless he could have proved that Becraft knew and fraudulently concealed it; and this (as is now evident) he could not have proved, even had the horse been thus affected. He was told by skilful persons, that it was probable the blowing was the effect of a cold or of an incipient distemper. He had some reason to entertain that opinion. Some time was necessary to the development of the actual condition of the horse, and weeks elapsed before it was known that the blowing was a. permanent defect, originating long before the sale, and of such a character as necessarily to have been understood by the vendor. It was certainly not the duty of Hoggins to propose a rescission of the contract before he could, *33 by ordinary means, have ascertained that a sufficient cause for rescission existed. And it does not appear, that he did know, or could, by the exercise of ordinary vigilance, have known that fact sooner, or much sooner, than about the time when he actually returned the horse. But, in the mean time, he had endeavored, more than once, to have the matter adjusted without a suit. When he sent the message about the first of December, 1829, he might have been more punctilious, and have made a formal tender of the horse at Becraft’s house. But such form and precision were surely not necessary at that time, when he thought that the horse had u the distemper” for which Becraft would not have been responsible, unless he had known and concealed the fact.
Ho<wins was verv anxious to buy the horse, and was, therefore, not desirous to rescind unless there was some permanent defect. It seems that even in February, 1830, when he wrote to Becraft and sent the horse, he was not sure that “ the distemper ” was not the cause ofthecondition of the horse. There is no positive proof that there was a formal tender at that time ; but there is enough to «hew that Becraft must have understood that a rescission of the contract was desired, and that the horse was sent for that purpose.
Now, whatever effect the communications in December and February, should have, according to technical law, they have a strong bearing in a court of equity: they evinced a disposition by one party to do right without punctilio, and a determination by the other to evade an amicable settlement. And there is nothing in the record tending to prove, that thei’e was any unreasonable, or even unusual, delay, in formally returning the horse, after Hoggins was fully and certainly informed of its true condition. Wherefore, as the condition of the horse, when returned, was as good as it was at any time after the sale, and even better, as the testimony may warrant us to infer ; and as Becraft cannot (according to the proof,) be subjected to any injury or loss in consequence of a failure by Hoggins to make a formal tender sooner, but on the contrary, the loss, if any, must fall on Hoggins, who kept the horse well (in the winter,) without mak *34 ing much Use of it, and as Hoggins seems, throughout, to have acted with candor and good faith, we cannot concur with the circuit court in opinion, that there was such an unreasonable delay in offering a rescission, as to bar the claim in a court of equity.
Moreover, if we could admit that the horse was not returned in a reasonable time, we should nevertheless be inclined to rescind the contract, because we are bound to infer that Aquilla Becraft has not only received the horse, but has appropriated it to his own use as his own, and thereby, in equity at least, waived any objection to the ■time of the tender.
The bill charges that the horse was “ returned ” to Aquilla Becraft, and remained in his possession. lie says, in his answer, that, he only received the horse to keep a few days, until Hoggins should visit him for the purpose of adjusting their controversy. But on that subject there is no proof; and there is abundant proof that he had the possession and use of the horse from the time it was returned'; and he has them, we presume, even yet. -.Now, from these facts, we do not feel permitted to presume that Becraft never received the horse. And consequently, on this ground alone, were there no other, the plaintiff seems to lie entitled to a perpetuation of his injunction. and to a decree declaring the contract for the horse rescinded.
Wherefore, it is decreed by this court, that the decree of the circuit court be reversed, and the cause remanded, with instructions to decree a perpetual injunction of the judgment at law.